UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
(at Covington)

| | | |
|---|---|---|
| PERFETTI VAN MELLE USA INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 2: 24-190-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| DEMATIC CORP., | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Defendant Dematic Corp. has filed a motion to dismiss all claims asserted by Plaintiff Perfetti Van Melle USA Inc. pursuant to under Rule 12(b)(6) of the Federal Rules of Civil Procedure. [Record No. 7] The motion will be granted because the plaintiff's Complaint fails to state viable claims alleging breach of warranty, unjust enrichment, and fraudulent misrepresentation.

### I. Background

Plaintiff Perfetti Van Melle USA Inc. ("PvM") manufactures and distributes confectionery and chewing gum under brand names including AirHeads, Mentos, and Trident. [Record No. 1-1 at 3] Defendant Dematic Corp. ("Dematic") is an engineering firm that designs, builds, and installs equipment that automates tasks in warehouse production. *Id.* In 2018, the parties contracted ("the Agreement") for Dematic to design and install a custom Mass Put Module ("Module") in PvM's warehouse. The Module would allow pallets to be loaded and wrapped along a conveyor system. [Record Nos. 1-1 at 3–4 and 7 at 3] The

Agreement specified a payment schedule, warranty provisions, process and significance of final acceptance, and the effect of subsequent change orders. [Record No. 1-1 at 4–5]

PvM paid $2,030,067.47 for the Module which was divided into several payments. [*See* Record No. 1-1 at 4, 6.] The final payment represented a ten percent retainer that the parties intended to be due thirty days after final acceptance of the Module. [Record No. 1-1 at 4] A two-year warranty was included in the total purchase price. The parties intended for the warranty to go into effect thirty days after final acceptance. *See id.* at 4–5, 8. Once that warranty period expired, all defect claims were to be waived except those identified through written notice provided by PvM to Dematic prior to expiration. *Id.* at 4–5.

Final acceptance of the Module was to occur when Dematic finished its work under the Agreement and testing was completed to PvM's satisfaction. [Record No. 7 at 3] Final acceptance was an important part of the execution of the Agreement because it modified the remedies available to PvM. Before final acceptance, PvM had broad remedies and could unilaterally terminate the Agreement; however, after final acceptance, PvM's "sole and exclusive" remedy was a warranty claim. [Record Nos. 8 at 4 and 7 at 4] The acceptance process included testing of the Module and criteria to determine whether it met performance and operational standards outlined in the Agreement. [Record No. 1-1 at 51–54] Final acceptance also played a role in triggering the beginning of the warranty period. *See id.* at 4–5, 8.

The Agreement outlined the effect of a change order: "[u]nless expressly modified by a Change Order, . . . the provisions of the Agreement and these General Terms and Conditions will govern all work performed under such Change Order." *Id.* at 88. The parties agreed upon four change orders between 2019 and 2021, and the final change order ("Change Order") was

executed by the parties in December 2021. *Id.* at 5. The Change Order deducted $165,988.42 from the total cost, and noted:

> In full consideration for the deduct amounts stated on this Order, the Parties agree: (1) Final Acceptance of the System was achieved on February 17, 2020, and (2) Each Party, on behalf of itself and its affiliated companies, hereby irrevocably and unconditionally release, acquit, and forever discharges the other Party and its affiliated, companies, successors and assigns from any and all known and unknown, foreseen and unforeseen, past or present claims, counterclaims, cross-claims, third-party claims, obligations, liabilities, damages, rights, losses, expenses, (including attorneys' fees), costs, and/or causes of action of every kind or nature arising from or relating in any way to the Agreement.

*Id.* at 116.

Under the Agreement signed in October 2018, the Module was slated to be installed and through final acceptance in June 2019. *Id.* at 6. However, due to delays caused by Dematic and the COVID-19 pandemic, it still had not been installed by January 2020. *Id.* Despite this, Dematic invoiced PvM the ten percent retainer almost two years before PvM's final acceptance of the Module. *Id.* The parties continued to address installation issues and disputed charges into October 2021 when Dematic proffered the Change Order. *Id.* PvM agreed to the Change Order two months later. *Id.* The Change Order stipulated that final acceptance occurred on February 17, 2020, and contained the above release language. *Id.* at 116. That final acceptance triggered the two-year warranty, which would end in February 2022.

Although PvM continued to have problems with performance and safety of the Module, the parties continued to work toward a resolution. *Id.* at 7. However, the parties' relationship changed in late summer 2022 when Dematic stopped responding to PvM. *Id.* Dematic did not solve or remedy the Module's problems under the warranty but, instead, offered to send its representatives to train PvM's staff at PvM's expense. *Id.* PvM brought this action alleging

three claims against Dematic: (1) breach of warranty (Count I), (2) unjust enrichment (Count II), (3) fraudulent misrepresentation (Count III). Dematic moved to dismiss all three counts.

## II. Legal Standard

To survive a motion to dismiss, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible upon its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While the Court need not accept legal conclusions or unwarranted factual inferences, the allegations in a complaint must be accepted as true and all reasonable inferences must be construed in the plaintiff's favor. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). However, the Court will dismiss a complaint if the factual allegations are insufficient "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

Courts are generally limited to considering the pleadings, but they may consider certain items without converting the motion to one for summary judgment such as public records, exhibits attached to the complaint, and those attached to the motion to dismiss "so long as they are referred to in the complaint and are central to the claims contained therein." *Bassett*, 528 F.3d at 430.

## III. Analysis

"Contract interpretation, including determining whether a contract is ambiguous, is a question of law for the courts[.]" *Butt v. Indep. Club Venture, Ltd.*, 453 S.W.3d 189, 192 (Ky. Ct. App. 2014) (citing *Morganfield Nat'l Bank v. Damien Elder & Sons*, 836 S.W.2d 893, 895 (Ky. 1992)). An ambiguous contract is one that a reasonable person would find "'susceptible to different or inconsistent interpretations.'" *Marshall v. Kentucky Farm Bureau Mut. Ins. Co.*, 618 S.W.3d 499, 502 (Ky. Ct. App. 2020) (quoting *Cantrell Supply, Inc. v. Liberty Mutual*

*Ins. Co.*, 94 S.W.3d 381, 385 (Ky. Ct. App. 2002)). If the Court finds ambiguity, then it will "'gather, if possible, the intention of the parties from the contract as a whole, and in doing so will consider the subject matter of the contract, the situation of the parties and the conditions under which the contract was written.'" *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 106 (Ky. 2003) (quoting *Whitlow v. Whitlow, Ky.*, 267 S.W.2d 739, 740 (1954)). When there is no ambiguity, however, "'a written instrument will be enforced strictly according to its terms,' and a court will interpret the contract's terms by assigning language its ordinary meaning." *Frear*, 103 S.W.3d at 106 (quoting *O'Bryan v. Massey–Ferguson, Inc., Ky.*, 413 S.W.2d 891, 893 (1966)).

A court interpreting a contract, must construe it as a "'whole, giving effect to all parts and every word in it if possible.'" *Am. Dairy Queen Corp. v. Fortune St. Rsch. & Writing Inc.*, 753 F. Supp. 2d 675, 679 (W.D. Ky. 2010) (quoting *City of Louisa v. Newland*, 705 S.W.2d 916, 919 (Ky. 1986)). To be sure, "'[t]he fact that one party may have intended different results . . . is insufficient to construe a contract at variance with its plain and unambiguous terms.'" *Butt*, 453 S.W.3d at 192–93 (quoting *Cantrell Supply, Inc.*, 94 S.W.3d at 385) Stated differently, "an otherwise unambiguous contract does not become ambiguous when a party asserts—especially post hoc, and after detrimental reliance by another party—that the terms of the agreement fail to state what it intended." *Frear*, 103 S.W.3d at 107.

"[A] release is a discharge of a claim or obligation and surrender of a claimant's right to prosecute a cause of action." *Id.* at 105 (internal citations and quotations omitted). The Supreme Court of Kentucky has made clear that contract rules apply to releases. *Am. Dairy Queen Corp.*, 753 F. Supp. 2d 675, 679 (W.D. Ky. 2010) (citing *3D Enterprises Contracting Corp. v. Louisville and Jefferson County Metropolitan Sewer Dist.*, 174 S.W.3d 440, 448 (Ky.

-5-

2005)). Therefore, ordinary contract defenses such as duress, fraud, or bad faith apply. *Humana, Inc. v. Blose*, 247 S.W.3d 892, 895 (Ky. 2008) (citing 15A C.J.S. Compromise & Settlement § 53, at 142 (2002)). Likewise, for a release to be valid, it must be supported by valuable consideration. *See Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1108 (6th Cir. 2010).

"A valid and enforceable release operates as a *complete bar* to a later action regarding any claim encompassed within the release." *Coffman v. AT&T, Corp.*, 678 F. Supp. 3d 880, 885 (E.D. Ky. 2023) (citations omitted) (emphasis in original). A release's scope "is determined primarily by the intent of the parties as expressed in the release instrument." *Ohio Casualty Insurance Co. v. Ruschell*, 834 S.W.2d 166, 169 (Ky. 1992) (citation omitted). "'[B]ecause releases are in the nature of settlements, the strong public policy in favor of encouraging the resolution of disputes is also implicated, and courts will interpret releases to further that policy.'" *Wysocki*, 607 F.3d at 1108 (quoting 66 Am. Jur.2d Release § 2).

Here, PvM alleges that Dematic breached its warranty "by failing to provide a [Module] free from defects" and "failing to perform the installation and commissioning of the [Module] in a professional and workmanlike manner." [Record No. 1-1 at 8] More specifically, it claims that the Module "has been a complete failure and has never properly functioned" and that Dematic has "refused to abide by its warranty obligations" and correct the Module flaws. *Id.* at 3. And this failure has caused PvM damages. [Record No. 8 at 7]

Alternatively, PvM alleges claims of unjust enrichment and fraudulent misrepresentation. It contends that if it cannot recover under breach of warranty then Dematic was unjustly enriched when it retained the benefit of PvM's payments without providing the promised goods and services. [Record No 1-1 at 8–9] Similarly, if no other claim stands, PvM

-6-

alleges: (1) Dematic misrepresented its intent to abide by the second-year warranty PvM purchased; (2) Dematic knew the statements it made were false or in reckless disregard for their truth as evidenced by its premature invoicing of the ten percent retainer; (3) that misrepresentation was to induce and did induce PvM to enter the Agreement; and (4) PvM was damaged when it relied on the warranty provision. *Id.* at 9–10.

Dematic contends that PvM has waived the counts included in the complaint because the "parties negotiated a complete resolution" of all potential claims in the Change Order. [Record No. 7 at 1] Dematic asserts that this language of the release is unambiguous and broad enough to encompass PvM's claims: "Each party. . . irrevocably and unconditionally release . . . any and all known and unknown, foreseen and unforeseen, past or present claims, . . . and/or causes of action of every kind or nature arising from or relating in any way to the Agreement." [Record No. 7 at 2] It adds that if the above language was not interpreted to include PvM's instant claims, then Dematic would be deprived of any benefit of discounting $165,988.42 as consideration for the release. *Id.* at 10.

In response, PvM insists that the ambiguous release only encompassed certain claims the parties were disputing at the time. [Record No. 8 at 7–16] Quoting the parties' original Agreement, PvM points out that, "[u]nless expressly modified by a Change Order or Work Order, the provisions of the Agreement and these General Terms and Conditions will govern all work performed under such Change Order or Work Order"; and therefore, any unenumerated claims in the release have not been waived. *Id.* at 8–9. PvM also contends that the Change Order release language is ambiguous as it refers to "the Agreement," which could be interpreted as the Change Order because the document header says "Agreement." *Id.* at 10.

-7-

This ambiguity, PvM continues, under contract interpretation rules must be construed against its drafter (Dematic). *Id.* at 10–11.

In Reply, Dematic argues that the parties contemplated that the release would encompass any warranty claims by emphasizing that only one month remained on PvM's second-year warranty when it signed the Change Order. [*See* Record No. 10 at 2, 6.] Further, Dematic challenges PvM's ambiguity argument by pointing to the header "Agreement Change Order" and referencing the notation that it applies to "Agreement No. 140501," which is the same proposal number on the Agreement. *Id.* at 7–8.

To resolve whether the release covers the instant claims, the Court first looks to its plain language to determine whether it is ambiguous. Here, there is no ambiguity regarding what "the Agreement" means in the Change Order because it plainly notes that it applies to Agreement No. 140501. There also is no ambiguity concerning whether PvM's claims are within the scope of the release. The release uses the broad language of "*any and all* known and unknown, foreseen and unforeseen, past or present claims . . . obligations, liabilities, damages, rights, losses, expenses, (including attorneys' fees), costs, and/or causes of action *of every kind or nature* arising from or *relating in any way* to the Agreement" (Emphasis added). It is difficult to imagine language that would be broader than what is included in the Change Order. Regarding the effect of the Change Order on the Agreement, the Agreement is clear that a change order can modify the Agreement. And that is exactly what the Change Order does.

PvM raises no contract defenses to the validity of the Change Order, and both parties are equally sophisticated marketplace participants. The release was supported by valuable consideration with Dematic forgoing over $165,000 and PvM stipulating that final acceptance

occurred and waiving "any and all" claims it could ever bring. Therefore, all PvM's claims will be dismissed because they are within the scope of the valid and enforceable release.

## IV. Conclusion

Based on the foregoing analysis and discussion, it is hereby

**ORDERED** as follows:

1. Defendant Dematic Corp.'s Motion to Dismiss [Record No. 7] is **GRANTED**.

2. Plaintiff Perfetti Van Melle USA Inc.'s claims for breach of warranty, unjust enrichment, and fraudulent misrepresentation are **DISMISSED**, with prejudice.

Dated: January 21, 2025.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky